Earl URBAN, Plaintiff,

v.

Keith R. HENLEY, et al., Defendants.

No. 84–4226.

United States District Court,
D. Kansas.

Jan. 20, 1987.

Steven A. Ediger, Hutchinson, Kan., for plaintiff.

Leon Patton, Asst. Atty. Gen., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a civil rights action brought by the plaintiff against the Kansas Adult Authority and the individual members of that body pursuant to 42 U.S.C. §§ 1981 and 1983. Plaintiff contends that his due process and equal protection rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was unlawfully incarcerated from May 13, 1983 to September 22, 1983 pursuant to the orders issued by the KAA. This matter is presently before the court upon plaintiff's motion for partial summary judgment and defendants' motion to dismiss. The court has heard oral argument and is now prepared to rule.

The facts relevant to this action are generally undisputed. On October 10, 1980, plaintiff was sentenced to one to two years in state court for criminal damage to property in violation of K.S.A. 21–3720. Plaintiff began serving his sentence on November 13, 1981. Plaintiff's conditional release date was set as May 13, 1983. On December 27, 1982, plaintiff was released on parole. Three days later he was again arrested. Thereafter, he was jailed as a parole violator. He then pled guilty to the charge upon which he was arrested. On February 14, 1983, defendant KAA revoked plaintiff's parole for his failure to abide by his release agreement. The KAA ordered plaintiff to serve to his conditional release date pursuant to K.S.A. 75–5217. Between February 14, 1983 and May 11, 1983, plaintiff received two institutional disciplinary convictions. The disciplinary board of the Department of Corrections entered a penalty of seven days disciplinary segregation and thirty days loss of good time, which was suspended for 120 days. On May 11, 1983, two days before plaintiff's conditional release, defendant KAA amended its order of February 14, 1983. The KAA ordered that plaintiff forfeit his good time credits and serve the remaining months of his maximum sentence, to November 13, 1983. Thereafter, on September 15, 1983, plaintiff filed a writ of habeus corpus in state court. On September 22, 1983, the writ was granted and the state judge ordered the plaintiff released from custody. The order stated: "[T]he Kansas Adult Authority was without statutory or regulatory authority to enter its order of May 11, 1983, whereby plaintiff was ordered to forfeit all good time credits and serve to his maximum sentence, and therefore petitioner should have been released on May 13, 1983, which was his conditional release date." Plaintiff then filed this action for damages on June 26, 1984.

In his complaint filed on June 26, 1984, plaintiff alleged his due process rights were violated by the defendants when they ordered the forfeiture of his good time credits on May 11, 1983. Plaintiff asserts that the KAA was without statutory authority to order such forfeiture. He further contends in the alternative that he was entitled to notice and a hearing prior to such forfeiture. Plaintiff seeks compensatory and punitive damages. On April 12, 1985, plaintiff sought to amend his com-

872

plaint to add that the rules and regulations adopted by the KAA were unconstitutional. On May 29, 1985, this motion was granted by the magistrate.

The court shall first consider plaintiff's motion for partial summary judgment. Plaintiff seeks, relying on *Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), to use the state court's decision in his habeas corpus action offensively to collaterally estop the defendants from relitigating the issue of whether the KAA had the authority to forfeit his good time credits. The defendants argue that *Parklane Hosiery* should not be applied here because of the differing circumstances of this case.

In *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Supreme Court held that the doctrine of collateral estoppel is applicable to actions brought under § 1983. The *McCurry* rationale for application of the collateral estoppel doctrine to § 1983 claims has since been elaborated on in several significant respects in *Kremer v. Chemical Constructions Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1981). In *Kremer*, the Supreme Court held that when, as here, a federal court is asked to give preclusive effect to a prior state court judgment, the federal courts are bound by the statutory directive of 28 U.S.C. § 1738 "to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Id.* at 466, 102 S.Ct. at 1889. Thus, we must look to Kansas law to determine whether, and to what extent, to give preclusive effect to the state court decision in this case. *See Duncan v. Clements*, 744 F.2d 48, 51 (8th Cir.1984). Plaintiff's reliance on *Parklane Hosiery* is misplaced. *Parklane Hosiery* sets forth the federal law, not the state law, on the application of collateral estoppel principles. Thus, its holding is inapplicable here.

In Kansas, there are two elements which must be present before the doctrine of collateral estoppel may be invoked as a bar to further action: (1) a judgment on the mer-

its which determines the rights and liabilities of the parties based on the ultimate facts as disclosed by the pleadings or issues presented for trial, and (2) the parties must be the same or in privity therein. *Penachio v. Walker*, 207 Kan. 54, 483 P.2d 1119 (1971). The key issue here is the second of these two requirements.

The proper defendant in a state habeas corpus action is the person responsible for the custody of the petitioner. *Richardson v. District Court of Finney County*, 179 Kan. 62, 292 P.2d 705 (1956). In this instance, the proper defendant in the plaintiff's habeas corpus action was the warden of the Kansas State Penitentiary at Lansing, Bernard Day. Mr. Day was originally a defendant in this action, but he died during the pendency of this action. The other defendants in this case were not parties to that action. Neither were they in privity with Mr. Day at the time of that action. Plaintiff relies heavily on the fact that the attorney that appeared in the state action represented the defendants in this case at the beginning of this litigation. This factor is of no significance given the different parties involved in this case. *See Garza v. Henderson*, 779 F.2d 390, 394 (7th Cir.1985). Accordingly, we conclude that the state court's decision in plaintiff's habeas corpus case cannot be used offensively in this litigation. The question decided in that case can be and must be litigated in this case.

The court shall now proceed to the defendants' motion to dismiss. In this motion, the defendants raise a number of arguments, most of them involving some sort of immunity. The court shall identify each of these arguments as we proceed through this opinion.

Before we reach the immunity issues raised by the defendants, the court shall briefly address one other matter. Defendants contend that plaintiff has failed to state a claim under 42 U.S.C. § 1981. We agree. The allegations of the complaint raise no facts which suggest that plaintiff has a claim under this statute. According-

ly, the court shall dismiss any purported claim by the plaintiff made under § 1981.

■ Defendant KAA, an agency of the State of Kansas, contends that plaintiff's claims against it are barred by the Eleventh Amendment. The court agrees. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Florida Dept. of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982); *Cory v. White,* 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982). Accordingly, plaintiff's claims against the KAA shall be dismissed.

The individual defendants assert that the Eleventh Amendment bars plaintiff's claims against them in their official capacities. The law is settled that an action against defendants in their official capacities is another way of pleading an action against the entity of which the defendants are agents—in this case, the State of Kansas. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Thus, the Eleventh Amendment bars an award of money damages as part of the official capacity actions in this case.

The individual defendants also contend that Eleventh Amendment protection should be extended to personal capacity suits based on K.S.A. 75–6116. The court has previously considered this argument and rejected it in *Ross v. Kansas Commission on Civil Rights,* No. 81–4132 (D.Kan., unpublished, 11/13/85). The court finds no reason to alter that conclusion in this case.

■ The individual defendants next assert that they are entitled to absolute immunity from liability for civil damages. In the alternative, the individual defendants contend that they are entitled to qualified immunity under the facts of this case.

The first issue that needs to be resolved is whether the individual defendants are entitled to absolute immunity for the action they took on May 11, 1983. The common law has long provided some form of immunity for government officials from suits for civil damages. Although § 1983 makes no express provision for immunity for any of-ficial, the United States Supreme Court has held that Congress did not intend § 1983 to impinge on this tradition of official immunity. *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951). The Court has established an elaborate set of rules on immunity for both state and federal officers. Absolute immunity has been provided to those "officials whose special functions or constitutional status requires complete protection from suit." *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). For most state officials, however, qualified immunity is the norm. *Id.*

The question of whether parole officials carrying out their parole board functions should be entitled to absolute immunity is far from settled. Both the Supreme Court and the Tenth Circuit have left the question open. *See Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980); *Humann v. Wilson,* 696 F.2d 783 (10th Cir.1983). The circuit courts have reached differing results. *See Trotter v. Klincar,* 748 F.2d 1177 (7th Cir.1984) (absolute immunity); *Evans v. Dillahunty,* 711 F.2d 828 (8th Cir.1983) (absolute immunity); *United States v. Irving,* 684 F.2d 494 (7th Cir.1984) (absolute immunity); *Sellars v. Procunier,* 641 F.2d 1295 (9th Cir.1981), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981) (absolute immunity); *Pope v. Chew,* 521 F.2d 400 (4th Cir.1975) (absolute immunity); *Wolfel v. Sanborn,* 666 F.2d 1005 (6th Cir.1981), *vacated on other grounds,* 458 U.S. 1102, 102 S.Ct. 3476, 73 L.Ed.2d 1363 (1982) (qualified immunity); *Fowler v. Cross,* 635 F.2d 476 (5th Cir.1981) (qualified immunity); *Thompson v. Burke,* 556 F.2d 231 (3d Cir. 1977) (absolute immunity for adjudicatory acts and qualified immunity for administrative acts).

In *Beck v. Kansas University Psychiatry Foundation,* 580 F.Supp. 527 (D.Kan. 1984), Judge Saffels of this district was faced with the issue of whether members of the KAA were entitled to absolute immunity or qualified immunity in a § 1983 action. Judge Saffels noted the split

among the circuits and chose to follow the decisions of the Fifth and Sixth Circuits cited above. After reviewing these decisions, as well as the decisions holding that parole officials are entitled to absolute immunity, we must respectfully decline to follow *Beck*.

Our refusal to follow *Beck* springs in part from the Fifth and Sixth Circuit decisions relied upon by Judge Saffels. The state of the law in the Fifth Circuit concerning the question of what immunity a state parole official has in a § 1983 suit is somewhat, if not totally, confused. In *Fowler v. Cross*, 635 F.2d 476 (5th Cir. 1981), the case relied upon by Judge Saffels in *Beck*, the Fifth Circuit held, relying on *Williams v. Rhoden*, 629 F.2d 1099 (5th Cir.1980) and *Henzel v. Gerstein*, 608 F.2d 654 (5th Cir.1979), that members of the Florida Parole Commission were entitled to qualified immunity in § 1983 actions for damages. *Fowler*, however, failed to mention several other Fifth Circuit cases, such as *Cruz v. Shelton*, 502 F.2d 1101 (5th Cir.1974) and *Pate v. Alabama Board of Pardons and Paroles*, 409 F.Supp. 478 (M.D.Ala.1976), *aff'd without published opinion*, 548 F.2d 354 (5th Cir.1977), which have held that state parole officials were entitled to absolute immunity. Perhaps the most confusing opinion to be issued by the Fifth Circuit on this topic is *Johnson v. Wells*, 566 F.2d 1016 (5th Cir.1978). *Johnson* has been curiously cited by the Fifth Circuit in later cases to support both the proposition that state parole officials are entitled to absolute immunity, *Hilliard v. Board of Pardons and Paroles*, 759 F.2d 1190, 1193–94 (5th Cir.1985), and that they are entitled to qualified immunity, *Henzel v. Gerstein, supra*, at 658–59. In *Johnson*, the Fifth Circuit, relying on *Cruz v. Shelton*, succinctly stated: "[P]arole officials are immune from damages under ... 42 U.S.C. § 1983." 566 F.2d at 1018. In sum, we are not convinced that the law in the Fifth Circuit mandates the application of qualified immunity to state parole officials. In fact, given the clear statement in the Fifth Circuit's most recent case on the issue, *Hilliard v. Board of Pardons*

*and Paroles, supra* at 1193–1194 ("This court holds that state parole board members are absolutely immune from liability for damages in a § 1983 action."), we believe that the Fifth Circuit would now provide state parole officials with absolute immunity in § 1983 actions.

We also do not find the Sixth Circuit case relied upon by Judge Saffels, *Wolfel v. Sanborn*, to be persuasive authority for the holding that state parole officials are entitled to only qualified immunity. In *Wolfel*, the Sixth Circuit does apply qualified immunity to the claims asserted by the plaintiff against state parole officers. The Sixth Circuit, however, does not consider the issue of whether the parole officers are entitled to absolute immunity. It does not appear from the opinion that the issue was ever raised. Thus, the Circuit's application of qualified immunity to the claims in the case, without any discussion of what immunity should be afforded state parole officials in § 1983 actions, is unpersuasive for the proposition that state parole officials *must* be afforded only qualified immunity. Furthermore, the court is unable to find any later Sixth Circuit case which applies the qualified immunity defense to parole officers.

The most important reason for not following *Beck* lies in our view of what the law is and should be on this issue. In examining the issue of whether to afford certain government officials with absolute or qualified immunity, the Supreme Court has generally adopted a two-pronged approach. The initial inquiry is whether there is a historical or common law basis for the immunity in question. *Mitchell v. Forsyth*, 472 U.S. 511, 521, 105 S.Ct. 2806, 2813, 86 L.Ed.2d 411 (1985). Thus, where an asserted immunity was established at common law when § 1983 was adopted and where its rationale was compatible with the purposes of § 1983, the Supreme Court has construed the statute to incorporate that immunity. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). However, if immunity was not established at common law for a

particular government official, the Supreme Court expands the inquiry to determine whether the official functions in a manner comparable to officials shielded by immunity when § 1983 was passed. *Cleavinger v. Saxner*, 474 U.S. 193, ——, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985). The "functional comparability approach" requires the court to focus on the function of the officer, not his or her position. *Briscoe v. LaHue*, 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983). "Absolute immunity flows not from rank or title or 'location within the Government,' ... but from the nature of the responsibilities of the individual official." *Cleavinger v. Saxner, supra.*

The court must proceed to the second inquiry in this case because it appears that immunity for parole board officials was not well-established at common law when § 1983 was enacted. *Sellars v. Procunier, supra* at 1298 n. 6. In considering whether the members of the KAA enjoy absolute immunity under the "functional comparability approach", the court finds the reasoning and analysis of the Ninth Circuit in *Sellars v. Procunier* very persuasive. In *Sellars,* the Ninth Circuit holds that state parole officials perform an adjudicatory function comparable to judges which warrants absolute immunity. The *Sellars* court presented the following reasoning:

> We believe that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny, or revoke parole. The daily task of both judges and parole board officials is the adjudication of specific cases or controversies. Their duty is often the same: to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake. They face the same risk of constant unfounded suits by those disappointed by the parole board's decisions.
>
> Judges enjoy absolute immunity from civil rights suits in order to keep the judicial decision-making process pristine. As noted earlier, we expect and require the judge to be an impartial fact finder. When he or she weighs the merits of a case, we do not want the scales to be tipped by fear of litigation. The adjudicatory process simply could not work if the adjudicator had to anticipate a possible lawsuit from every dissatisfied litigant.
>
> We believe that the same degree of protection must be accorded to the decision-making process of parole board officials. Just as the decision-making process of judges must be kept free from fear, so must that of parole board officials. Without this protection, there is the same danger that the decision-maker might not impartially adjudicate the often difficult cases that come before them. If parole board officials had to anticipate that each time they rejected a prisoner's application for parole, they would have to defend that decision in federal court, their already difficult task of balancing the risk involved in releasing a prisoner whose rehabilitation is uncertain against the public's right to safety would become almost impossible. Furthermore, time spent in depositions and on the witness stand defending their actions would leave these overburdened public servants with even less time to perform their crucial tasks.

*Id.* at 1303.

This court concurs with the reasoning and holding of *Sellars.* We find further support for this holding in a recent decision of the Supreme Court. In *Cleavinger v. Saxner, supra,* the Supreme Court was faced with the issue of whether the members of a prison's institution discipline committee were entitled to absolute or qualified immunity from personal damages liability for actions violative of the United States Constitution. The Court ultimately concluded that such officials were entitled only to qualified immunity. In reaching this determination, the Court specifically noted that they had not decided the issue of whether state parole officials enjoy absolute or qualified immunity, but the Court did distinguish service on a disciplinary committee from service upon a traditional parole board. The Court appeared to indi-

cate that a parole board functioned comparable to a judge. The Court stated:

Neither do we equate this discipline committee membership to service upon a traditional parole board. The board is a "neutral and detached" hearing body. *Morrissey v. Brewer*, 408 U.S. 471, 489 [92 S.Ct. 2593, 2604, 33 L.Ed.2d 484] (1972). The parole board member has been described as an impartial professional serving essentially " 'as an arm of the sentencing judge.' " *Sellars v. Procunier*, 641 F.2d., at 1302, n. 15, quoting *Bricker v. Michigan Parole Board*, 405 F.Supp. 1340, 1345 (ED Mich. 1975). And in the penalty context, the parole board is constitutionally required to provide greater due process protection than is the institution discipline committee. *Wolff v. McDonnell*, 418 U.S. [539] at 561 [94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974)].

*Id.*

Finally, we also find some additional support for this holding in a recent Tenth Circuit decision. In *Tripati v. United States Immigration and Naturalization Service*, 784 F.2d 345 (10th Cir.1986), the Tenth Circuit held that federal probation officers who prepared pretrial release and presentence reports were absolutely immune from an action for damages. Although we recognize the different functions performed by probation officers and parole officials, we do believe that similar rationales are applicable for treating these positions in a like manner. *See, e.g., Spaulding v. Nielsen*, 599 F.2d 728 (5th Cir.1979) (court relies in part on decision granting parole officials absolute immunity in determining that federal probation officers are entitled to absolute immunity).

Therefore, we hold that members of the KAA are absolutely immune from damages in § 1983 actions. This holding, however, does not end our inquiry in this case. Plaintiff contends that the members of the KAA cannot be afforded absolute immunity in this case because they were acting without statutory authority on May 11, 1983 when they extended his incarceration until the end of his term. Thus, the court needs to determine if the members of the KAA are entitled to absolute immunity under the specific facts of this case. In making this determination, the court shall be guided by the standards that have been established in cases involving judicial immunity for the obvious reason set forth previously that parole board officials perform functionally comparable tasks to judges when they decide to grant, deny or revoke parole.

The doctrine of judicial immunity will protect a judge against liability for a given act if two conditions are satisfied. First, the act must not have been taken in the "clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978). Protection may be afforded even if the act was prompted by malicious or corrupt reasons, "flawed by the commission of grave procedural errors," or taken in excess, but not in clear absence, of jurisdiction. *Id.*, at 356, 359, 98 S.Ct. at 1104, 1106. Second, the act must be a "judicial act." *Id.*, at 360–62, 98 S.Ct. at 1106–07.

The application of these conditions shall determine if the members of the KAA are entitled to absolute immunity here. We think little time need be spent on the second of the two requirements. The act must be a parole board action to afford the KAA members absolute immunity. In *Sparkman*, the Supreme Court provided this guideline in making this determination:

The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity.

*Id.*, at 362, 98 S.Ct. at 1107. The facts here clearly demonstrate that the act of the KAA members requiring the plaintiff to serve to his maximum sentence was a typical parole board action. Thus, there is little question that we are concerned with a "parole board act."

The closer question is whether the KAA members acted in "absence" of or in "excess" of their jurisdiction. The distinction between acts taken in "excess" of jurisdiction and acts taken in the "clear absence of all jurisdiction" was illustrated in *Sparkman* with examples taken from *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 352, 20 L.Ed. 646 (1872). 435 U.S. at 357 n. 7, 98 S.Ct. at 1105 n. 7. The Supreme Court further said that, in determining whether clear absence of jurisdiction has been shown, the fact that the power to take a given action is not expressly included in a judge's jurisdiction under state law is less significant than the fact that it is not expressly excluded from that jurisdiction. *Id.*, at 358, 98 S.Ct. at 1105.

A determination of whether the KAA members were acting in "absence" of or in "excess" of their jurisdiction requires an examination of their roles in Kansas government. In Kansas, the supervision and management of individuals ordered incarcerated are generally carried out by two agencies: the Department of Corrections and the KAA. The Department of Corrections is responsible for the supervision and management of the correctional institutions in the State. K.S.A. 75–5205(a). The KAA has the authority to release on parole those persons confined in correctional institutions who are eligible for parole. K.S.A. 22–3717(e). The KAA also has the power to revoke parole upon a violation of the conditions of release. K.S.A. 75–5217(b).

There are three dates of importance to an individual incarcerated in Kansas: parole eligibility date, conditional release date and maximum term date. An inmate may become eligible for parole in a variety of ways depending upon his sentence. K.S.A. 22–3717. Generally, an inmate becomes eligible for parole after serving his minimum sentence less good time credits. K.S.A. 22–3717(a). At this point, the authority to release on parole is vested in the sound discretion of the KAA. K.S.A. 22–3717(e). The conditional release date is the date when an inmate shall be released for service of the maximum sentence less statutory authorized good time credits. K.A.R.

45–1–1(e). Generally, an inmate must be released on this date. An inmate conditionally released is treated as if on parole until his maximum term date. The maximum term date is the final day of the inmate's maximum sentence. This is an inmate's release date if he has not been granted parole or earned any good time credits.

In this case, plaintiff was a parole violator. The procedures for handling a parole violator are set forth in K.S.A. 75–5217(b). The released inmate is brought before the KAA for a hearing. If the KAA determines that a parole violation has occurred, they may "continue or revoke the parole or conditional release, or enter such other order as the [KAA] may see fit." K.S.A. 75–5217(b). The KAA may "require a violator to serve all or any part of the remaining time on the sentence." K.A.R. 45–9–1(g). The KAA may also order the forfeiture of good time credits if a parolee is found to be in violation of parole. K.A.R. 45–9–1(h).

■ The question presented by this case is whether the KAA had the power to issue its order of May 11, 1983, which extended plaintiff's incarceration beyond his conditional release date. After reviewing the relevant statutory and regulatory provisions, the court tends to agree with the state court judge in plaintiff's habeas corpus action who found that the KAA lacked authority to issue its order of May 11, 1983. We note, however, that there is room for argument on this issue. The precise question to be decided is whether the KAA has authority to amend an order, *sua sponte*, after they decide what to do with a parole violator. The statutes and the regulations do not speak to this particular issue. They provide neither authority nor prohibition against such action. Nevertheless, our reading of K.S.A. 75–5217(b) supports the view that the KAA has no further authority after they enter their order determining what to do with a parole violator. Thus, under the facts of the instant case, the KAA would have been without authority to act on May 11, 1983, when they ordered

that plaintiff must serve to his maximum term date after they learned of his disciplinary violations. The KAA had previously directed that plaintiff serve to his conditional release date following their finding that plaintiff had violated his parole. This was the end of their power and they had no authority to subsequently amend the order. The defendants have suggested that the KAA's authority continued after it directed that plaintiff serve until his conditional release date based on the language in K.S.A. 75–5217(b) which provides that the KAA may "enter such other order" as it sees fit. We believe that this interpretation broadens K.S.A. 75–5217(b) beyond what the Kansas legislature contemplated in writing the statute. In sum, we tend to agree with the plaintiff that the KAA was without authority when it entered its order of May 11, 1983.

Once again, this decision does not control the outcome of this case, despite the arguments made by plaintiff. Plaintiff believes that since the KAA lacked authority to take the action it did on May 11, 1983, then the KAA acted in clear absence of all jurisdiction and cannot be immune from their conduct. Thus, plaintiff equates "lack of authority" with "clear absence of jurisdiction." This is simply an incorrect view of the law. The Supreme Court makes this clear in *Stump v. Sparkman*. *Stump* involved the question of the judicial immunity of a judge who ordered the sterilization of a fifteen year old girl upon her mother's petition. The Supreme Court found that the state court judge had acted without statutory or common law authority in ordering the sterilization. Nevertheless, the Court concluded that the judge was entitled to judicial immunity because he had not acted in the clear absence of jurisdiction. *Also see, e.g., Scott v. Hayes*, 719 F.2d 1562 (11th Cir.1983) ("egregious error" committed by judge in suggesting or ordering that plaintiff undergo a vasectomy as a condition of a property settlement in a divorce action did not deprive judge of judicial immunity); *Billingsley v. Kyser*, 691 F.2d 388 (8th Cir.1982) (lack of authority to amend plaintiff's criminal sentence does not de-

prive defendant judge of judicial immunity); *Jacobson v. Schaefer*, 441 F.2d 127 (7th Cir.1971) (lack of authority to attach certain conditions to plaintiff's bail does not deprive judge of judicial immunity); *Berg v. Cwiklinski*, 416 F.2d 929 (7th Cir. 1969) (lack of authority to hold plaintiff in contempt for exercise of right of self-incrimination does not deprive judge of judicial immunity).

The court's review of the instant facts suggests that the KAA members acted in "excess" of their jurisdiction, not in clear absence of all jurisdiction. The KAA has the authority, under Kansas law, to exercise certain controls over both inmates eligible for parole and parole violators. Plaintiff was both an inmate eligible for parole and a parole violator. In conclusion, we find that the members of the KAA are absolutely immune from damages under § 1983 for the actions taken on May 11, 1983.

Based on the foregoing decision, the court need not reach the defendants' qualified immunity argument. However, if we were to reach to it, we would probably find that the members of the KAA are entitled to qualified immunity under the facts of this case based on the standard set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The law does not appear to have been clearly established on the claims made by the plaintiff since the plaintiff's case was the first controversy involving these issues. Thus, we would probably grant qualified immunity to the members of the KAA if the court had not reached the decision we did on the absolute immunity issue.

The court acknowledges the unfairness which occurs as a result of this opinion. Nevertheless, the doctrine of absolute immunity has been universally approved "[d]espite the unfairness to litigants that sometimes results." *Stump v. Sparkman, supra* 435 U.S. at 363, 98 S.Ct. at 1108. Such immunity is not for the protection of malicious and corrupt government officials, but for the overall benefit of the public. *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct.

1213, 1217, 18 L.Ed.2d 288 (1967). The nation is best served by having government officials who perform judicial functions act with independence and freedom from concern for personal liability. *See Sellars v. Procunier, supra,* at 1303.

With the decision reached in this opinion, the court finds it unnecessary to consider the other arguments raised by the parties in this case. Further, with the dismissal of all of plaintiff's federal claims, the court shall also dismiss any pendent claims made by the plaintiff. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Jones v. International Power Project,* 794 F.2d 546, 549 (10th Cir.1986).

IT IS THEREFORE ORDERED that defendants' motion to dismiss be hereby granted for the reasons stated in the foregoing memorandum.

IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment be hereby denied.

IT IS SO ORDERED.